JAMES GLASPY *vs.* SAMUEL CABOT, JR.

SAME *vs.* JAMES POWER & another.

Suffolk. March 19. — Sept. 7, 1883. DEVENS & W. ALLEN, JJ., absent.

If the master of a vessel, which has drifted upon a beach in a damaged condition, sells her, without right, to a person who, after repairing her, getting her off, and taking her into port, sells her hull to another person, the latter is liable for the conversion of the hull; and, in an action against him by the owner, the measure of damages is the market value of the hull at the time and place of the conversion.

If the master of a vessel, which has drifted upon a beach in a damaged condition, sells her, without right, to a person who repairs her, gets her off, and takes her into port, the buyer is liable for her conversion; and, in an action against him by the owner, the measure of damages, if there is no market at the place where she lay when bought, is her value there, determined by her value at a port where there is a market for such a vessel, less a reasonable allowance for the probable cost of repairing her, getting her off, and taking her into port, and for diminution in her market value on account of having been ashore, and for the risk of getting her to market.

TWO ACTIONS OF TORT. The first action was for the conversion of "the hull of the schooner Mary A., the property of the plaintiff." The second action was for the conversion of "one schooner, called the Mary A., together with the sails, rigging, anchors, chains, small boat, and other appurtenances belonging to said vessel," alleged to be the property of the plaintiff. The answer in each case denied that the property mentioned in the declaration was the plaintiff's property, and denied any conversion. Trial in the Superior Court, without a jury, before *Pitman,* J., who allowed a bill of exceptions, in substance as follows:

It appeared that the schooner, with the appurtenances above mentioned, was owned by the plaintiff, who resided in St. John, New Brunswick, where the vessel also belonged and was registered; that she was built in 1868, was of sixty-four tons burden, and was one of a class of vessels called "woodboats" at St. John, which are small schooners with two masts but no bowsprit, and much used in the transportation of wood in the vicinity of St. John, and in or about the Bay of Fundy; that on September 6, 1880, while on a voyage from St. John to Salem, with a cargo of bark, under the command of the plaintiff's son, Charles Glaspy,

she went ashore on the bar off Annisquam Harbor, where she remained about twelve hours, and then floated over the bar, having lost an anchor and chain and disabled her rudder, besides suffering other damage, filled, and again drifted ashore on Coffin's Beach, so called, inside the harbor; that she remained there until September 13, 1880, when Patrick Murphy, one of the defendants in the second case, came to Annisquam and offered the master, whom he met at the railway station in Gloucester, $80 for her as she lay, with her appurtenances, which offer the master accepted, and thereupon delivered her to Murphy; that the crew of the vessel had left her two days after she went ashore, and, at the time of this sale, the vessel had no one on board; that she was in a damaged condition, and was opened and strained so that the tide ebbed and flowed in her, and she was somewhat imbedded in the sand on the beach; and that the sale was made without a previous survey of the vessel being held, without consultation or advice on the part of the master, and without advertising or offering her for sale by public auction.

The plaintiff's evidence tended to show that the sale by the master was not justified by necessity, and that the master acted improperly in making it. The defendant's evidence tended to show that the schooner could not have been got off and repaired without an expense exceeding her value when repaired, and that the master acted, under the circumstances, for the best interest of all concerned.

It appeared that, some days after the above sale of the vessel, the defendant Power, at Murphy's request, who wrote to him telling him what he had done, and asking him to come there, sent to Annisquam a small vessel owned by him and used by him in his business of wrecking, provided with spare anchors, chains, pumps, and other wrecking material, and manned by a crew of six men employed and paid by him. With this assistance, and the services of one or more persons employed by him at Annisquam, he got the schooner off from Coffin's Beach, recovered her anchor and chain, took her to the other side of the harbor, repaired her partially, and then sent her to Boston in charge of one of the persons employed at Annisquam and of some of the men sent by Power. A spare pump, sent down on

Power's vessel, was in constant use on the way to Boston, besides the schooner's own pump. Some weeks after her arrival at Boston, she was broken up by the defendants in the second action; and, on December 30, 1880, her hull was sold by them for $200 to the defendant Cabot, who then took possession of and used it. After the vessel arrived at Boston, and before the sale to Cabot, the plaintiff came to Boston and had one or more interviews with the defendants in the second action, at which he demanded the vessel, and made them certain offers of money for her, which were refused. This was the first knowledge the defendants had that the sale was disputed. No demand was made at any time upon the defendant Cabot, and he had no notice or knowledge of the plaintiff's claim at the time of his purchase of the hull. The plaintiff's evidence tended to show that these offers were made in repayment of the amount paid for the vessel, and for salvage claim on the same, and "rather than to have any trouble." The defendant's evidence tended to show that they had expended about $200 in getting her off and taking her to Boston and repairing her, exclusive of their own services and the use of the schooner and tools; that the offers made were not sufficient to make good their outlay, and were refused by them in part for that reason. The necessity and amount of these expenditures were contested by the plaintiff.

The plaintiff offered no direct evidence as to the value of the vessel and appurtenances, as she lay on Coffin's Beach, at the time of the sale by the master to Murphy, and no evidence as to the separate value of the hull at any time, except the sale to Cabot. He offered evidence tending to show that, in 1876, he paid $600 for one half the vessel; that, in 1877, the other half, with the right to sail her on shares, was sold for the same price, and that, in 1878, he bought this other half for $575. The market value of the vessel and appurtenances at St. John, as she was before going ashore, was estimated by the plaintiff's witnesses at from $1000 to $1400. The plaintiff's evidence further tended to show that the vessel could have been put in as good condition as before she went on the bar at Annisquam for from $150 to $200.

The defendant's evidence tended to show that the market value of the schooner in Boston or vicinity, as she was before

going ashore, would not exceed $400 or $500, and that this was so partly on account of her British register and the consequent inability to register her as an American vessel, and partly on account of her build and model above described, schooners of that description not being in general use and not in demand here. The defendant Power testified that, in Boston, she was not worth more than " the stuff you could get off her," even before her damage ; that such soft wood vessels with iron fastenings were not expected to last over nine years. The defendants' evidence also tended to show that the value of the vessel and appurtenances, as she lay on Coffin's Beach at the time of sale, subject to all risks and expenses, would not be over $100 or $200 for any purpose; and that the repairs, which the plaintiff's witnesses testified could be made at Annisquam for $150 or $200, would not be sufficient to make the vessel seaworthy. There was also conflicting evidence as to the extent of damage sustained by the schooner, the condition of her timbers, fastenings, and appurtenances, and as to the durability of vessels built of similar material, and the length of time in which they wear out. There was no evidence that she was a peculiar or unusual vessel, except as above set forth.

Upon all the evidence in the case, the judge found that the sale was not justifiable ; and that the defendants Power and Murphy were jointly liable for the conversion of the vessel and appurtenances, and that the defendant Cabot was liable for the conversion of the hull.

The defendants asked the judge to rule that the defendants Power and Murphy, if liable, were liable only for the value of the schooner with her appurtenances at the time of the attempted sale to Murphy and in her then situation ; and that, in estimating the damages for her conversion, neither her value to her owners nor her market value at her home port was admissible, but that her value as she then lay upon Coffin's Beach, for any purpose, subject to all risks and expenses, was the measure of damages.

But the judge refused so to rule ; and, being of opinion that, upon the above evidence, there was not, in the proper and usual sense of the term, any market value for the vessel, as such, at the time and place of conversion, ruled that the plaintiff might

recover of the defendants Power and Murphy the market value of the vessel and appurtenances at St. John, less a reasonable allowance for the probable cost of getting her off, repairing her, and getting her there, less also a reasonable allowance for diminution in her said market value on account of having been ashore; and that he might recover against the defendant Cabot the value of the hull at the time and place of the conversion by him; and assessed damages for the plaintiff at $550 in the first action, and $200 in the second action, with interest from the time of conversion. The defendants alleged exceptions.

*F. Dodge*, for the defendants.

*G. R. Swasey*, ( *C. G. Dyer* with him,) for the plaintiff.

FIELD, J. Cabot converted to his use the hull when he purchased it in Boston, and took possession of and used it as his own. The changes in the hull, whereby its value had been increased, which had been made by Murphy after he purchased the schooner then lying on Coffin's Beach, were not made at the request of the plaintiff, and if the plaintiff had retaken or replevied the schooner from Murphy in Boston, he would have received her in the condition she was then in.

The market value of the property at the time and place of conversion, with interest from that time, is admitted to be the general rule for the measure of damages, but the damages are diminished when the property is in whole or in part delivered to the owner, or when the defendant has a lien upon it, or when the plaintiff has only a special or partial interest in it, and is not responsible over to another person for any of the damages recovered. These cases fall within neither of these exceptions.

The conversion by Murphy and those acting under him was when he purchased the schooner, and took possession of her as his own. This is a distinct conversion from the conversion of the hull by Cabot. The damages for this conversion by Murphy and his co-defendant cannot be enhanced by the increased value of the schooner from the repairs and changes in her condition they made after they had converted her to their own use, but must be confined to the value of the schooner as she lay on Coffin's Beach. If damages are recovered for this conversion for the full value of the schooner as she lay on Coffin's Beach, and are paid, the title to the schooner vests in

Murphy and his co-defendant as of the time when they took possession of her, and the plaintiff's right of action against Cabot is necessarily discharged. If damages are recovered against Cabot for the full value of the hull, and he pays them, it seems that these damages must be regarded as a satisfaction *pro tanto* of the judgment against Power and Murphy. Cabot may have his action against his vendors for the value of the hull, on the ground of an implied warranty of title, if there were such a warranty, but that is immaterial to the rights of action of the plaintiff.

*Dresser Manuf. Co.* v. *Waterston,* 3 Met. 9, was the case of a conditional sale, and *Green* v. *Farmer,* 4 Burr. 2214, is the only case cited for the rule of damages adopted; but in *Green* v. *Farmer* the question argued was whether " the defendants have a lien upon these goods for more than the price of dyeing," and it was decided that they had no lien for a general balance of account, but only for dyeing the particular goods. In conditional sales the vendee has ordinarily a right to sell his interest, whatever it may be. *Day* v. *Bassett,* 102 Mass. 445. *Currier* v. *Knapp,* 117 Mass. 324. *Chase* v. *Ingalls,* 122 Mass. 381. *Newhall* v. *Kingsbury,* 131 Mass. 445.

But if there be an exception to the general rule of damages, when an action in the nature of trover is brought against a purchaser from a conditional vendee, who has improved the property while in his possession, it is not necessarily applicable to these cases, because here the original taking was tortious. In replevin, any improvements of the property attach to and go with the property replevied. In trover, when the property has been improved in value after the conversion, the form of the action does not render it necessary that damages should be given for the improved value; and the general principle is that the damages shall compensate the plaintiff for what he has lost. The rule of confining the damages to the time of the conversion, with interest from that time, has been adopted in this Commonwealth as the most satisfactory; and many difficulties are avoided which arise under any other rule, when the value of the property is fluctuating, or when the property has been improved in value or changed in form by the wrongful taker after the conversion and before the trial. In the event of successive conversions, if the value

of the property at the time of the first conversion were always taken as the test of damages, then it might often happen that a defendant who had subsequently converted the property would be held to pay more than the property was worth when he converted it. The damages caused by one wrong would be measured by those caused by another. *Kennedy* v. *Whitwell*, 4 Pick. 466. *Stone* v. *Codman*, 15 Pick. 297. *Greenfield Bank* v. *Leavitt*, 17 Pick. 1. Murphy and his co-defendant had no right to convey to Cabot, as against the plaintiff, the improvements they had made upon the hull, and as the title continued in the plaintiff, we know of no cases which decide that, under the circumstances disclosed in these exceptions, Cabot is not liable in damages for the market value of the hull at the time and place of its conversion by him. The question does not arise whether the damages recoverable against Cabot can in any event exceed the whole amount of damages recoverable against Power and Murphy. The ruling of the court upon the measure of damages in the action against Cabot was correct.

The remaining question is the measure of damages in the action against Power and Murphy. These defendants converted the schooner as she lay on Coffin's Beach in Annisquam Harbor. If there was no market for such a vessel at Annisquam, it was her value as she lay there that the defendants are liable to pay. But in determining her value there by her value elsewhere, a reasonable allowance must be made " for the probable cost of getting her off, repairing her, and getting her " to market, " less also a reasonable allowance for diminution in her market value on account of having been ashore." These allowances were made. The risks and chances of getting her afloat and getting her to market must also be taken into account. If there was no market at Annisquam, the learned justice had a right to consider, in assessing damages, the market value in St. John, if that was the principal market, or one of the principal markets, in which such vessels are bought and sold, and it was practicable to attempt to carry her there. He had a right also to consider other markets ; the test is what buyers of vessels, from St. John, Boston, or other ports, would pay for her as she, lay on Coffin's Beach, if all the facts of her condition were known. If there were no direct satisfactory evidence of this, and the

court was satisfied that St. John was the best market, and that it was practicable to attempt to take her there, her market value when taken to St. John could be considered; but, in addition to the allowances made from her market value in St. John, there should have been an allowance for the fair value of the risks of getting her there. If she were properly repaired for the voyage, the usual rate of insurance for such a vessel on such a voyage would be evidence of the value of the risk of taking her from the port of repair to St. John. Perhaps a fair salvage for getting her off and bringing her to a port of repair, when the salvors would be entitled to nothing except out of the property saved, would be evidence of the amount of the allowance to be made for the risk and cost of removing her to such a port. We think the rule of damages adopted was too liberal under the circumstances stated in the exceptions, and that there must be a new trial in the second action, upon the amount of damages only. *Bourne* v. *Ashley*, 1 Lowell, 27. *Saunders* v. *Clark*, 106 Mass. 331. *Coolidge* v. *Choate*, 11 Met. 79.

*Ordered accordingly.*